Opinion filed August 28, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed August 28, 2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-08-00071-CR

                                                    __________

 

                                      RAMON CISNEROS, Appellant

 

                                                             V.

 

                                         STATE
OF TEXAS, Appellee

 



 

                                         On
Appeal from the 118th District Court

                                                         Howard
County, Texas

                                                     Trial
Court Cause No. 9786

 



 

                                              M E
M O R A N D U M   O P I N I O N

The
jury convicted Ramon Cisneros of murder and assessed his punishment at
confinement for seventeen years and six months.  We affirm.

                                                                 Issues
on Appeal








Appellant
has briefed seven issues on appeal.  First, appellant contends that the trial
court abused its discretion by denying his motion to sever and granting the
State=s motion to
consolidate his trial with the trial of a codefendant.  In his second and third
issues, appellant argues that the evidence is both legally and factually
insufficient.  In the next four issues, appellant contends that the trial court
erred when it failed to instruct the jury on the issue of sudden passion
arising from adequate cause, to instruct the jury when his codefendant entered
a plea bargain agreement, and to submit charges on the lesser included offenses
of aggravated assault and criminally negligent homicide.  We will address the
challenges to the sufficiency of the evidence first.

                                                        Sufficiency
of the Evidence

Appellant
contends that the evidence is legally and factually insufficient to support his
conviction.  In order to determine if the evidence is legally sufficient, the
appellate court reviews all of the evidence in the light most favorable to the
verdict and determines whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319 (1979); Laster v. State, 275 S.W.3d 512,
517-18 (Tex. Crim. App. 2009); Jackson v. State, 17 S.W.3d 664, 667
(Tex. Crim. App. 2000).  To determine if the evidence is factually sufficient,
the appellate court reviews all of the evidence in a neutral light.  Laster,
275 S.W.3d at 519; Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App.
2006); Johnson v. State, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000);
Cain v. State, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); Clewis v.
State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996).  Then, the reviewing
court determines whether the evidence supporting the verdict is so weak that
the verdict is clearly wrong and manifestly unjust or whether the verdict is
against the great weight and preponderance of the conflicting evidence.  Watson,
204 S.W.3d at 414-15; Johnson, 23 S.W.3d at 10-11.

Appellant
and Dennis Boswell were indicted for the murder of the victim by causing him to
fall from the side of a bridge.  Appellant and Boswell were tried in a joint
trial.

Big
Spring Police Detective Jim Rider testified that he knew the victim as a
transient who kept his things in three different Acamps.@  Detective Rider usually
saw him walking up and down Highway 87.  Olga Perches testified that she called
the victim AAustralia@ because he would tell her
things about Australia when he came into the Rip Griffin Travel Center on
Interstate 20 where she worked.  Perches stated that the victim often talked
about Aoff-the-wall
things@ but that he
would not Aharm@ anyone.








On
the night of his death, the victim came into the travel center between 10:00
and 11:00 p.m.  Perches saw the victim leave the store and walk toward the
bridge that crossed Interstate 20.  There was a light blue car in the
parking lot.  Perches saw two girls get out of the car.  She also saw a man
walk quickly after the victim.  Later, she heard an ambulance.  The man and the
two girls came into the building and used the restrooms.  While Perches was
asking a customer if he knew what had happened, the man who had followed the
victim walked passed her.  Perches identified the man as appellant.  Perches
stated that she knew Boswell because she had worked with him.  Perches stated
that the man she saw follow the victim was not Boswell.

Big
Spring Police Department Patrol Sergeant John Stowers testified that he
responded to a call concerning a vehicle/pedestrian accident under the North
Highway 87 bridge crossing Interstate 20.  Sergeant Stowers received the call
shortly before 11:00 p.m.  He located the victim=s
body directly under the bridge, but could not find any evidence that a vehicle
had actually struck the victim.

Wayne
Jones, an identification technician for the Big Spring Police Department,
testified that the victim had been removed when he arrived on the scene.  Jones
photographed the area, including the bloodstain on the highway.  Jones found
two sets of shoe prints on top of the bridge.  The prints were against the rail
of the bridge.  One set of prints matched the victim=s shoes; the other set of prints were not identified. 
The distance from the location of the shoe prints on the bridge to the highway
below was twenty-eight feet.

Jones
stated that he found the footprints next to the rail where a Ahalf moon shape of dirt@ had Aaccumulated from the
weather and that type of thing.@ 
Jones estimated that the area was two feet by one and one-half feet.  There was
no dirt on the rest of the bridge.  Jones testified that the footprints on the
bridge were about a foot to the right of and above the bloodstain on the
highway below.  There was no evidence of drag marks.

At
the emergency room, Jones photographed the victim and removed items from the
body.  Jones found a wallet and a pocketknife.  The pocketknife was located A[d]eep down@ in the pocket of the
victim=s jeans.  The
blade was bent and not very sharp.  In the victim=s
other pocket was a shank that appeared to have been made from a broken letter
opener.  However, there were no grind marks on the shank except at Athe very end where [it had]
been broken off.@

Jennifer
Cisneros testified that, about two years prior to the victim=s death, he had harassed
her where she was working at that time.  She and the victim had a Aconfrontation@ one morning, and she was
shoved up against the wall.  When Jennifer told the victim that she was going
to call the police, the victim told her Athat
he knew where [Jennifer and her daughter] laid [their] heads at night.@  He left, and she did not
report the incident to the police.








Jennifer
saw the victim again two years later on the night that he died.  At that time,
she was dating appellant; at the time of trial, she and appellant were married. 
Jennifer, appellant, Boswell, J.P. McBride, and LaFond Johnson were sitting in
Boswell=s baby blue
car outside of the travel center; they were waiting on Boswell=s girlfriend to get off
work.  Jennifer and appellant had been arguing and drinking.  When the victim
walked out, Jennifer told appellant that the victim had hurt her Aone time.@

Appellant
became angry at the victim and told Boswell to let him out of the car. 
Jennifer stated that she thought appellant wanted to confront the victim. 
Eventually, Boswell allowed appellant to get out of the car.  Boswell asked
appellant if he Awant[ed]
to go back.@  Jennifer
testified that Boswell meant did appellant want to go back to jail.  Appellant
said that nobody was going to hurt Jennifer and started to walk after the
victim.  Jennifer testified that Boswell said, A
F--k it, then.@ 
Boswell grabbed the keys from the ignition, Afollowed@ appellant, and Aheaded out@ toward the bridge. 
Jennifer did not see what happened because she went inside to use the
restroom.  She did see that appellant had Amet
up with@ the victim,
and she remembered that appellant=s
hands were up.

Jennifer
was inside the store waiting for Johnson to get off the phone when appellant
returned.  Appellant was very serious and told her to A[g]et in the car.@  Appellant did not tell her what had happened
on the bridge.

Later,
Boswell=s girlfriend
said that a dead man was found under the bridge.  Jennifer was shocked and
scared.  Jennifer remembered appellant saying that he Adidn=t
do it.@  Jennifer
testified that she was terrified when she gave her statement to police and that
that was why some of her testimony at trial varied from her prior statement.

Teresa
Paige was traveling toward the bridge with her windows down and her sunroof
open. She could hear people arguing.  While she was stopped at a traffic light,
she saw an older man who was Ahunched
over@ walk right
behind her car.  A Hispanic male was yelling at the older man. Another man told
the Hispanic man to stop.  The situation made Paige nervous, and she rolled up
her windows, shut the sunroof, and locked the doors.  She drove off when the
light turned green.  She looked back in her rear view mirror and saw two men on
the bridge.  She thought that the Hispanic man was holding the older man by his
shoulders, but she could not be sure.








Johnson
testified that she went with Jennifer, Boswell, and appellant to wait for Boswell=s girlfriend to get off
work.  Jennifer saw the victim and said that one time he had threatened to hit
her.  Appellant got mad and said that he was going to Abeat [the victim=s]
ass.@  Johnson said
that they tried to talk appellant out of it.  Johnson testified that they had
all seen the victim Aplenty
of times@ and that she
knew he was not Amentally
all there.@  Boswell
asked appellant, AMan,
do you want to go back?@ 
Johnson stated that she thought Boswell meant did appellant want to go back to
prison.  Appellant said, AI=ll go back.@  Boswell and appellant Atook off running.@  Before he left, appellant
gave Johnson money to make a phone call.  Johnson thought that Boswell and
appellant were going to harass the victim, and she went inside the store to
make a phone call.

Johnson
stated that, the next time she saw appellant, she was still on the phone. 
Appellant told her to get off the phone and said something about throwing Athe guy over the bridge.@  Johnson testified that
she did not know if appellant was serious and that she Afreaked out@
and hung up the phone.  They sat in the car for a few minutes.  She saw the
police cars and the emergency vehicle. They drove off.  Later, they stopped,
and appellant and Boswell got out of the car.  Johnson could tell that the men
were arguing.  She was nervous and told them that she wanted to go home.  They
took her to her mother=s
home.

Dr.
Glenn Robert Groben testified that he was a deputy medical examiner in Lubbock
County.  Dr. Groben performed the autopsy on the victim.  The victim had
injuries to his head and upper chest.  The main injury was a laceration and
contusion to the back of his head.  The victim had a depressed skull fracture
where the bone had been driven toward the center of his skull.  This injury was
consistent with a fall from the bridge and with the victim landing on his
back.  The victim=s
spine was broken in two places, and his spinal cord was torn in both places. 
He also had contusions on his brain and multiple skull fractures.  On his left
side, his ribs were fractured and had torn into his lungs.  Dr. Groben
testified that the large bruise across the victim=s
back appeared to be the area of impact.  Dr. Groben concluded that the victim
died as a result of injuries from the fall.  Dr. Groben further testified
that the victim was 5'10" tall and weighed 190 pounds.  The victim tested Atotally negative@ for drugs and alcohol.  He
was of medium build and was fifty-one years old. 








The
last witness the State called was appellant.  Appellant waived his rights under
U.S. Const. amend. V and agreed
to be called as a witness for the State as a Atactical
decision@ out of a
concern that a directed verdict might be granted in favor of Boswell.  The
trial court thoroughly admonished appellant on the record.

Appellant
testified that Ano
deal@ was involved
with his testimony and that he had elected for the jury to determine punishment
in the event that the jury found him guilty.  Appellant stated that he
understood it was unusual for the State to call a codefendant as a witness,
that he could have waited to testify after the State had rested, and that he
chose to testify at that time because he wanted the jury to hear his story.

Appellant
testified that he was sitting behind the driver in the car at the travel
center.  Boswell, Jennifer, Johnson, and McBride were in the car with him. 
Four of them had drunk a six-pack of tall boys.  They were waiting on Boswell=s girlfriend to get off
work.  Appellant testified that there were Asome
quite attractive looking ladies@
in the car next to them.  When appellant Alet
Mr. Boswell in on it,@
Jennifer got mad and started to argue with him.  He knew that what he had said
was Awrong@ so he Asat there@ and Atook it.@

The
victim came out of the store.  Appellant stated that he had seen the victim
before and that A[e]veryone
has seen him walking up and down Gregg Street.@ 
Jennifer told him, AThat=s the guy that threatened
me and Hija.@ 
Appellant testified that AHija@ meant Jennifer=s daughter.  Appellant
stated that he took it upon himself to Athreaten
the guy.@

At
first, Boswell would not let him out of the car.  When he did, appellant Achased the guy.@  His only intentions Awere just to threaten the
guy.@  Appellant had
his hands up in the air and was yelling.  He was not aware that Boswell had
followed him.  The victim threw his hands up in the air, and appellant stated
that he Atook that as
a confrontation.@  The
victim kept walking, and appellant Achased@ him.

Twice
before they got to the bridge, appellant and the victim stopped and faced each
other.  Appellant testified that he threw up his hands and asked the victim, AWhat=s up?@
and AYou like to beat
on women.  Why don=t
you try to beat on a man?@








Appellant
caught the victim on the bridge.  The victim was standing on the sidewalk, and
appellant stated that that made the victim Alook
a lot bigger than@
him.  Appellant testified that he had already made a Abutt@
out of himself by confronting the victim and that he was Anot going to back down from
[the victim] after [appellant] had called him down.@  The victim reached back like he had
something in his hand.  Appellant testified that he thought about three times
and then said, AThe
hell with it.  Let=s
get it on.@

Appellant
stepped up onto the sidewalk and lost his footing.  He fell down on all fours,
and the victim grabbed him in a headlock.  Appellant testified that he had no
idea what happened next.  He was Alaying
on [his] butt on the road,@
and then Boswell was helping him up.  He had heard footsteps but did not know
who it was.  He did not know if the victim jumped or if Boswell Aclotheslined@ him.  Appellant stated
that Boswell was in the area when the victim jumped, fell, or slipped. 
Appellant testified that he was twenty-eight years old and Aabout six foot@ tall.

The
State rested, and appellant testified in his own behalf.  Appellant testified
that he had been friends with Boswell for about twelve years.  Boswell was like
a brother to him, and it was Atough@ to testify at this trial. 
Appellant testified that he thought that the victim might have been pushed or Aclotheslined.@  Appellant testified that,
if he was going to admit in his letters to Jennifer and to another girlfriend
that he had pushed the victim over the bridge, he Awould have pleaded guilty.@  Appellant stated that in
the letters he did not talk about pleading guilty but that he talked about a Adeal@ that had been brought to him.  Appellant
stated that he did not say that he had pushed the victim over the bridge.

Appellant
stated that he was the person who was angry with the victim, not Boswell. 
Boswell had tried to stop him from confronting the victim.

On
cross-examination, appellant testified that he and Boswell had been in fights
together on many occasions and that Athey
covered each other=s
back.@  Appellant
stated that he had never had to help Boswell out because Boswell always Atook care of his own.@  Appellant stated that
Detective Rider Ahad
an attitude toward [him]@
and that he had told Detective Rider that he had been at home all night making
love to his girlfriend to get the detective Aoff@ his back.








The
jury, as the finder of fact, was the sole judge of the weight and credibility
of the witnesses=
testimony.  Tex. Code Crim.
Proc. Ann. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  The
appellate court reviews the factfinder=s
weighing of the evidence and cannot substitute its judgment for that of the
factfinder.  Cain, 958 S.W.2d at 407; Clewis, 922 S.W.2d at 133. 
Due deference must be given to the factfinder=s
determination, particularly concerning the weight and credibility of the
evidence.  Johnson, 23 S.W.3d at 9; Jones v. State, 944 S.W.2d
642 (Tex. Crim. App. 1996).  This court has the authority to disagree with the
factfinder=s
determination Aonly
when the record clearly indicates such a step is necessary to arrest the
occurrence of a manifest injustice.@ 
Johnson, 23 S.W.3d at 9.  We also note that circumstantial evidence of
intent must be reviewed with the same scrutiny as any other element of the
offense.  Laster, 275 S.W.3d at 519-20.

When
viewed in the light most favorable to the verdict, the evidence is legally
sufficient to support the jury=s
determination that appellant committed the offense alleged.  A rational
factfinder could have reasonably concluded that appellant caused the victim=s death.  Likewise, when
viewed in a neutral light, we find that the evidence is factually sufficient to
support the verdict.  As the factfinder, the jury observed the demeanor of each
witness and could accept or reject any or all of a witness=s testimony.  Articles
36.13, 38.04; see Marshall v. State, 210 S.W.3d 618, 625 (Tex.
Crim. App. 2006).  The jury could have reasonably rejected appellant=s testimony that he did not
know what happened and accepted the testimony that appellant was seen on the
bridge holding the victim by his shoulders.  From the testimony describing the
position of the victim on his back on the interstate highway below and over
about a foot from the footprints on the bridge above and the testimony of the
confrontation between appellant and the victim, the jury could have concluded
that appellant caused the victim=s
death as alleged in the indictment.  While the verdict is afforded less
deference under a factual sufficiency review, the appellate court is not free
to override the verdict simply because the appellate court may or may not agree
with it.  Laster, 275 S.W.3d 520.  The evidence is not so weak that the
verdict is clearly wrong and manifestly unjust, and the verdict is not against
the great weight and preponderance of the conflicting evidence.  The second and
third issues are overruled.

                                           Joint
Trial of Appellant and Dennis Boswell

As
stated above, both appellant and Boswell were indicted for the murder of the
victim.  Each indictment contained enhancement allegations.  On appeal,
appellant argues that, since both men had prior convictions, Athe issue is one of
prejudice to [appellant=s]
case.@  Appellant
contends that he never asked Boswell to help and that his contact with the
victim ceased before Boswell=s
contact began.  Therefore, the denial of the severance prevented the jury from
considering these scenarios separately.








In
his motion to sever, appellant only argued that Boswell=s prior conviction would be prejudicial and
that a joint trial would cause Aantagonistic
defenses.@  Appellant
did not present his argument that his conduct and Boswell=s conduct were in fact two
separate criminal episodes that could not be joined under Tex. Penal Code Ann. ' 3.02 (Vernon 2003). 
Therefore, appellant has failed to preserve this complaint for appellate
review.  Tex. R. App. P. 33.  The
record does not support appellant=s
complaints that the joinder resulted in prejudice to him.  Appellant testified
as to his prior convictions.  Appellant has not established that the trial
court erred.  The first issue is overruled.

                                                               Charge
to the Jury

A.
Boswell=s Plea
of Guilty.

The
jury began deliberations at 12:17 p.m.  At 4:30 p.m., the jury sent the following
note: AWe have made a
decision on one of the defendants.  We remain in deliberation of the second,
possibly deadlock.@ 
The trial court responded, AThank
you for your update.  Please continue your deliberations.@  At 5:15 p.m., Boswell=s attorney informed the
trial court that Boswell had entered into a plea bargain agreement.  Boswell
agreed to plead guilty to the offense of manslaughter, and the State
recommended incarceration for ten years.  The trial court proceeded to discuss
the situation with Boswell and to admonish him.  The trial court then accepted
Boswell=s plea,
convicted him of manslaughter, and imposed the recommended punishment of
confinement for ten years.

The
trial court then announced that it was sending  a note to the jury stating, AYou are hereby instructed
that you should immediately terminate your deliberations as to the Defendant
Dennis Boswell.  If you have reached a verdict as to the Defendant Ramon
Cisneros, you should notify the bailiff and then return into court with your
verdict.  Otherwise, please continue your deliberations.@  Appellant objected on the grounds that that
would send a message to the jury that the State had dismissed the charges
against Boswell.  After some discussion, the trial court proposed bringing the
jury into the courtroom to ask if the jury was still in agreement as to one
defendant and, if so, ask as to which defendant the jury was in agreement.  If
the jury answered that appellant was the defendant about whom it agreed, then
the trial court would instruct the jury to go back into the jury room and
indicate to the bailiff that a verdict had been reached.  The trial court asked
appellant if there was A[a]ny
problem with that.@ 
Appellant stated, ANone.@








The
jury entered the courtroom at 5:55 p.m., and the trial court asked the
presiding juror if the jury was still in concurrence on its decision as to one
of the defendants.  The presiding juror answered yes.  The trial court asked if
the jury was still in a deadlock as to the other defendant.  The presiding
juror answered yes.  When the trial court asked which defendant the jury had
reached a decision upon, the presiding juror answered that it was appellant. 
The trial court then instructed the jury to return to the jury room and, if it
had not already done so, to prepare its verdict.  The trial court further
instructed the jury to knock on the door when it was finished, and at that
time, the jury would be brought back into the courtroom so that the trial court
could receive the jury=s
verdict as to appellant.

 Appellant
now complains of the very procedure to which he had agreed.  Appellant=s fifth issue presents
nothing for appellate review.  Rule 33.  The fifth issue is overruled.

B.
Lesser Included Offenses.

Appellant
complains that the trial court erred in failing to include his requested
submission on the lesser included offenses of aggravated assault and criminal
negligent homicide.  We disagree.

In
determining whether the jury should be charged on a lesser included offense, a
two-step analysis is applied.  Segundo v. State, 270 S.W.3d 79, 90-91
(Tex. Crim. App. 2008); Hall v. State, 225 S.W.3d 524, 525 (Tex. Crim.
App. 2007).  The appellate court first considers the allegation in the
indictment to decide if the offense is a lesser included offense of the charged
offense and then  examines the record for evidence from which a rational jury
could acquit the defendant of the charged offense while convicting him of the
lesser included offense.  Segundo, 270 S.W.3d at 90-91.

As
alleged in the indictment, both aggravated assault and criminal negligent
homicide are lesser included offenses of murder.  However, there is no evidence
in the record upon which a rational jury might have acquitted appellant of
murder while convicting him of either aggravated assault or criminal negligent
homicide.  Appellant=s
testimony was that he intended to only threaten the victim, that the victim was
the aggressor who put a headlock on him forcing him to the ground on all fours
and on his butt, and that Boswell had to pull him up off the ground.  The
requested charges were not supported by the evidence.  Therefore, the trial
court did not err.  The sixth and seventh issues are overruled.

C.
Sudden Passion.

In
his fourth issue, appellant contends that the trial court erred by denying his
request at the punishment phase for an instruction on the defense of sudden
passion.  We disagree.

Tex. Penal Code Ann. ' 19.02 (Vernon 2003)
defines the offense of murder and provides in relevant part:

(d)
At the punishment stage of a trial, the defendant may raise the issue as to
whether he caused the death under the immediate influence of sudden passion
arising from an adequate cause.  If the defendant proves the issue in the
affirmative by a preponderance of the evidence, the offense is a felony of the
second degree.

 

Section 19.02(a)
defines adequate cause as that cause that would commonly produce a Adegree of anger, rage,
resentment, or terror in a person of ordinary temper, sufficient to render the
mind incapable of cool reflection.@ 
Section 19.02(a)(2) defines sudden passion as Apassion
directly caused by and arising out of provocation by the individual killed or
another acting with the person killed which passion arises at the time of the
offense and is not solely the result of former provocation.@

 Appellant
did not sustain his burden of establishing that the victim provoked a degree of
response that a person of ordinary temper would have acted as he did.  He did
not affirmatively establish either adequate cause or sudden passion as defined
by Section 19.02.  He did establish that he intended to threaten the victim
because the victim had threatened Jennifer at sometime in the past.  Therefore,
the trial court did not err.  McKinney v. State, 179 S.W.3d 565, 569
(Tex. Crim. App. 2005).  The fourth issue is overruled.

                                                                        Holding

The
judgment of the trial court is affirmed.

 

 

RICK STRANGE

JUSTICE

August 28, 2009

Do not publish. 
See Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.